UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:07CR173 |
| | ) | |
| | ) | DEFENDANT'S BRIEF |
| v. | ) | IN SUPPORT OF MOTION |
| | ) | UNDER 28 U.S.C. SEC. 2255 |
| | ) | |
| CARLA GRIFFIN | ) | |
| | ) | |

_____

NOW COMES Carla Griffin, by and through her attorney, Sandra Barrett, and hereby submits this brief in support of her motion under 28 USC Sec. 2255 in the above referenced matter.

## SUMMARY OF ARGUMENT

Griffin believes that trial counsel grossly under-represented her by failing to adequately research, investigate and otherwise prepare for trial and sentencing, and that he gave her incompetent, deficient and careless advice that pressured her into signing an ambiguous Plea Agreement and Factual Resume. His gross errors directly and negatively affected the sentence and restitution award against her, and in totality, amount to ineffective assistance of counsel.

Griffin argues that the district court erred as a matter of law in accepting the government's erroneous calculations of loss, resulting in the imposition of an

unreasonable sentence and order of restitution. She further argues that since it was stipulated by the Factual Resume that her involvement in the mortgage fraud conspiracy was limited to the nine-month period from March through November 2002, the government knew or should have known that its calculations of victim impact were far outside allowable limits under the applicable law and the Sentencing Guidelines and, therefore, amount to prosecutorial misconduct.

**I.  A DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL IS A BASIC, NECESSARY RIGHT ENCOMPASSED IN OUR JUSTICE SYSTEM AND SHOULD NOT BE LIGHTLY OVERLOOKED.**

It has long been settled under *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) that the Sixth Amendment guarantees criminal defendants the effective assistance of counsel. The Supreme Court in *Wiggins* required that the defendant make a threshold showing that (1) her attorney's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. The *Strickland* court defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Strickland,* 104 S.Ct. 2052, 2070.

A thorough reading of the transcripts of the Rule 11 and Sentencing hearings in this case clearly shows that Griffin's defense counsel was unprepared and lacked the requisite level of zealousness which reasonable standards require. Because of the procedural errors made by the District Court and defense counsel's failure to object to the lack of proper procedures or to offer arguments in support of an adversarial position, Griffin contends there is more than a reasonable probability that the outcome would have been more favorable to her otherwise.

The appellate courts are not inclined to delineate specific acts constituting actual ineffectiveness, and Griffin does not ask that this court do so now. Rather, she contends that the Court should find that, pursuant to the principles outlined in *Strickland* and to insure the proper functioning of the adversarial process in a criminal sentencing proceeding, the procedures expounded in the precedent under *Gall v. U.S.,* 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), should be followed to the letter and it is both the responsibility of the District Court, the prosecutor and effective counsel to assure that is done.

Not to require these procedural guarantees and failure of the courts to hold the parties involved accountable simply opens the appellate floodgates and serves no one well. As the Supreme Court in *Booker,* has said, ". . .yet let it be again remembered, that delays, and little inconveniences in the forms of justice, are the

price that all free nations must pay for their liberty in more substantial matters. . .", *U.S. v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

Exactly what constitutes an objective standard of reasonable performance by defense counsel defies succinct definition; however, the Tenth Circuit has noted two issues that should be addressed in evaluating an ineffective-assistance claim. One is whether defense counsel failed to consult with a criminal defendant regarding a pivotal issue, and the other is whether the attorney failed to follow his client's instructions on a pivotal issue. *U.S. v. Garrett,* 402 F.3d 1262 (2005).

In this case, the Defendant claimed at the sentencing hearing that her attorney had not counseled with her satisfactorily prior to and regarding entry of the guilty plea. Griffin's attorney stated on the record, at the sentencing hearing, that he "quite frankly told her that if she went to trial she had a zero chance of succeeding". (*Sentencing Hearing Transcript,* pg. 124, lines 24-25). In so doing, trial counsel put inexcusable pressure on Griffin to sign the Plea Agreement and Factual Resume even though she did not entirely agree with all the statements made therein. This is evidenced by the fact that during the plea hearing, the court was forced to order a recess in order to give Griffin and her attorney an opportunity to further discuss the Factual Resume, resulting in substantial changes being handwritten into the document by the Defendant during the hearing.

Beyond that, trial counsel, by his own admission on the record, stated that "perhaps she felt pressured by me." (*Sentencing Hearing Transcript,* pg. 125, line 7).

In defense counsel's consultations with Griffin on the pivotal issue of how to plead, his advice was deficient, careless and incompetent; furthermore, it is manifestly clear from the record that he was not doing what his client wished. A defendant's agreement to waive trial and plead guilty is implicitly conditioned on the assumption that the proceedings will be conducted in accordance with constitutional guarantees. Counsel was unable to edit and negotiate a Plea Agreement and Factual Resume that accurately represented the circumstances because he was unprepared for trial. Even the prosecutor admitted on the record that because the Plea Agreement contained appeal waivers that excepted claims of prosecutorial misconduct and ineffective assistance of counsel, "now we have a record that's just set up for a 2255, and I'll say it right out." (*Sentencing Hearing Transcript,* pg. 126, lines 8-9).

Likewise, trial counsel was inexcusably unprepared for sentencing in a matter that involved complicated calculations of loss, which directly affected the length of sentence and amount of restitution. In a case which should have had financial experts to analyze the data and testify accordingly, he did not file a

sentencing memorandum, did not call any witnesses and was unable to effectively cross-examine the government's witnesses. Due to a multitude of errors and oversights, including counsel's failure to act, the loss calculation was grossly flawed, leading to an excessive sentence and restitution award.

It should be noted that although the district court judge sentenced Griffin within the guideline range and there were no aggravating sentencing factors cited, the 60-month sentence was the statutory maximum. There is, therefore, a reasonable probably that, had the loss calculations been done properly, Griffin would have received a lower sentence, as well as a lower restitution award.

**II. IF THE GOVERNMENT HAS NO OBLIGATION UNDER ANY CIRCUMSTANCES TO DRAFT CLEAR, UNEQUIVOCAL, STRAIGHT-FORWARD PLEA DOCUMENTS, THEN THE PROCESS IS HOLLOW ILLUSION, AT BEST, AND MISLEADING TRICKERY, AT WORST--NEITHER OF WHICH IS ACCEPTABLE UNDER OUR SYSTEM OF JURISPRUDENCE, WHICH IS BASED ON AND GUARANTEED FAIRNESS OF TREATMENT.**

It may be fair to say that most prosecutors believe that every convicted criminal deserves the full guideline sentence;. However, they should also recognize that the government, as well as the defendant, derives benefits from entering into plea agreements. Furthermore, those benefits come with a price to both sides. That's all as it should be and fair.

The prosecutor in this case drafted both the Plea Agreement and the Factual Resume, which are ambiguous and unclear with regard to the number of victims and transactions which Griffin exposed herself to for sentencing purposes when she signed them. This is blatant prosecutorial misconduct when there were simple, readily available alternatives. The government could have drafted the provisions differently, or it could have followed the United States Sentencing Commission's recommendation that "the court defer acceptance of the plea agreement until the court has reviewed the presentence report." *U.S.S.G. Manual, (*November, 2008), thus giving the parties an opportunity to assess the defendant's exposure early on and eliminating sentencing surprises. The government chose to do none of these things. Instead, the government committed further prosecutorial misconduct by pursuing a sentence which it knew was unreasonable and unfair.

Section 2B1.1(b)(1) USSG outlines increases in the offense level based on incrementally increasing levels of loss. A fair reading of the record indicates that most, if not all, the government's argument regarding loss was driven by a desire to reach the $2.5 million increment. Griffin contends such argument was inappropriate and amounts to prosecutorial misconduct. Even if their calculation methodology had been correct, which it was not, the government proffered a loss of $2.1 to $2.3 million, presumably actual and intended respectively.

The government argued that although the actual and intended loss amounts had been determined, the court could find the loss to be over $2.5 million based on the doctrine of reasonable foreseeability, and the fact that $2.3 million was "so close" to $2.5 million.  However the doctrine of reasonable foreseeability is misplaced here, as it would come into play under the sentencing guidelines when there is no exact way of determining actual loss.  In Griffin's case, the actual loss can be adequately verified without placing any undue burden on the court, and therefore, is the figure the court is bound to.  It does not take a legal scholar to know that $2.3 million is <u>not</u> $2.5 million--it is $2.3 million no matter how the USSG incremental schedule appears.  Therefore, at the least, Griffin is entitled to a two-level reduction in her sentence because the increase was not allowable under the law, thus rendering her sentence unreasonable.

### III. THE DISTRICT COURT ERRED AS A MATTER OF LAW BY NOT USING THE CORRECT METHODOLOGY TO CALCULATE LOSS FOR PURPOSES OF SENTENCING.

A loss calculation is required for three reasons:  (1) to determine the offense level increase relevant to the guideline sentence range; (2) to determine the number of victims relevant to the guideline sentencing range; and (3) to determine the restitution award.

Griffin takes issue with the government and the court for both the loss

calculation methodology they used and for the ensuing illegality and unreasonableness of the sentence. Because the district court grappled extensively with the application of the sentencing guidelines regarding loss calculation, and there appears to be no Fourth Circuit decision directly on point, Appellant relies on interpretations espoused by other circuit courts, as well as the general principles of fairness and justice.

Griffin first assigns error to the court's calculation of loss based on the totality of the scheme, rather than on the limited period of time she was involved and the limited victims that her participation impacted. Although it is true that the defendant's role in the conspiracy is irrelevant to the conviction, the same cannot be said as it relates to the sentence. For example, the person who drives the get-away car in a bank robbery will be convicted just like the one who grabbed the money from the teller and ran out of the bank. However, that get-away driver could not be convicted of a robbery committed at a later date which he was unaware of. Similarly, Griffin's sentence must be based solely on the fraudulent activities which she participated in and was aware of. According to the record, that encompassed a time period from March through November 2002, and exactly six (6) loan applications she approved for the promoter while working at Countrywide during that period.

Although the government stated it was limiting Griffin's loss exposure to the stipulated time period, it proffered as evidence of loss, a spread sheet prepared by Countrywide which listed eleven (11) loans Griffin had approved. It should be remembered that Griffin was working as an underwriter for Countrywide at the same time she was involved in the conspiracy with George, so it would be expected that she was the underwriter on more than the six "George" transactions during the pertinent time period. Although Countrywide may have incurred losses associated with the other five loans on that spread sheet, those losses should not have been be attributed to Griffin. Many factors, not the least of which is the widely felt economic downturn in the housing market around that time, could have caused those particular losses, and indeed, may well be the sole reason for all of Countrywide's losses.

The government has the burden of proof to establish the actual pecuniary loss attributable to a defendant's misconduct. *U.S. v. Jimenez,* 513 F3d 62 (3rd Cir. 2008). Although traditional rules of evidence do not apply to sentencing hearings, the district court should not give weight to information having an insufficient indicia of reliability to support its accuracy, and if the reliability of evidence is an issue, the court should conduct an evidentiary hearing. *U.S. v. Wilkinson,* 590 F3d 259 (4th Cir. 2010), *U.S. v. Bowman,* 926 F2d 380 (4th Cir.

1991). In addition, the district court must provide a sufficient explanation of its reasons for the loss calculation. *Wilkinson,* @269.

At Griffin's sentencing, the government offered a schedule prepared by Countrywide purporting to establish the company's losses. Defense counsel objected to the legitimacy of the document, noting that, "I can't figure out from the document itself where 2.1-some-odd million comes from. It's simply listed there." To this the court replied, "I do agree with you it does talk about estimated potential losses on fraud loans and it's not actual losses, and it doesn't say explicitly how Countrywide arrived at it." (*Sentencing Hearing Transcript,* pg. 51-52).

As other evidence of loss, the government put on one witness, FBI Special Agent McNeely ("McNeely"), who presented two spreadsheets he had prepared. McNeely testified that the first spreadsheet covered Countrywide loans that Griffin was affiliated with between April and September 2002, although neither the number of transactions nor their identifying addresses are in the record. McNeely acknowledged that the first spreadsheet did contain one transaction which was outside the stated time period for a home Griffin herself purchased, but is not disclosed whether she underwrote the loan. McNeely further testified that certain columns on the spreadsheet were intended to identify "proceeds to promoter", defined as the money that ended up in the promoter's hands after the initial

closing, and "price spread", defined as the difference between a valid market price at the time of sale and the fraudulently inflated appraisal value. (*Sentencing Hearing Transcript,* pg. 28-29). McNeely's testimony was that his total on the first spreadsheet came to $2.38 million; however there was no testimony as to what exactly that was a total of. According to McNeely, the second spreadsheet incorporated all the properties that George closed with various lenders during the same stated time period and indicated a total proceeds to promoter of $4,288,331. (*Sentencing Hearing Transcript,* pg. 35-36).

On cross examination, when asked what was the fair market value of one of the properties Griffin underwrote, McNeely answered, "That's a tricky question. Rather than try to become an appraiser of the property, what we looked at, rather, was what was the agreed price between the seller and Gordon George; what had been negotiated at that time, and we used as the valid price rather than try to put ourselves in an appraisal role in this transaction." (*Sentencing Hearing Transcript,* pg. 39). He further testified that he did not think a valid price could be found on the public records, and that the proceeds to the promoter represented the intended loss. (*Sentencing Hearing Transcript,* pg. 139, 43). Later in the hearing, defense counsel stated that based on the government's exhibits, the "potential loss" would be $1.472 million and not $2.3 million. (*Sentencing Hearing Transcript,* pg. 53).

The court then ruled that "intended loss is the standard" and found that the government's Exhibits strongly corroborated each other in showing that Griffin was directly involved in an excess of $2 million in fraudulent loans. (*Sentencing Hearing Transcript,* pg. 55). Still later in the hearing, the district judge ruled "as a matter of law and fact, that in most every instance the proceeds to the promoter is both the actual loss, because it's a measurable loss on the day of the transaction, as well as not only is the actual loss on that, it's also the gain to Mr. George that day also." (*Sentencing Hearing Transcript,* pg. 83). Griffin contends that this ruling is clearly in error, as a matter of law, or, in the alternative, is so vague as to defy analysis.

The method for calculating the loss in this case is not nearly as complicated as the government tried to make it. In fact, the Sentencing Guidelines give clear instruction and leave little, if any, up to the imagination of the court. For purposes of sentencing, the loss is the greater of actual or intended loss, with "actual loss" being the reasonably foreseeable pecuniary harm that resulted from the offense and "intended loss" being the pecuniary harm that was intended to result from the offense. The guidelines define "pecuniary harm" as monetary, specifically excluding harm to reputation or other non-economic harm. The guidelines further require that exclusions from loss and credits against loss be calculated.

Noteworthy is that interest, finance charges and similar charges, as well as costs to the government or its witnesses incurred in the prosecution shall not be included in the loss. Similarly, the fair market value of pledged collateral or the amount the victim has recovered from disposition of pledged collateral shall be credited against the loss. *USSG, Sec. 2B1.1, Application Note #3.*

Under the guidelines, if the loss cannot reasonably be determined, the court may use the gain that resulted from the offense as an alternative measure of loss. Also, the court may reasonably estimate the loss based on available information and appropriate factors such as the fair market value of property taken, or if that's impracticable, the cost to the victim of replacing it. *USSG, Sec. 2B1.1, Application Note #3.*

It is appellant's position that the intended loss attributable to her is zero, because she intended no monetary harm to result and could not reasonably foresee future losses because at that time, the real estate market was at its peak. From her perspective, everyone, including the lender, was making money. Furthermore, zero intended loss is consistent with the Fifth Circuit ruling that to determine intended loss, the court should consider the defendant's actual, and not constructive, intent. *U.S. v. Goss,* 549 F3d 1013 (2008). As events unfolded, however, Griffin was proven wrong, and an actual loss occurred. The actual loss

calculation is actually quite simple but was erroneously rejected by the court. First, it should be understood that whatever price the straw sellers and/or buyers agreed to is irrelevant, because those parties were participants in the scheme and, therefore, are not to be counted as victims nor their losses, if any, added to the calculations.

Countrywide, as the lender, is Griffin's sole victim, and their loss should be calculated by taking the amount of the funded loan on each of the six properties which Griffin underwrote for George and subtracting either the actual sale price of the collateral recovered by Countrywide in foreclosure or, if the collateral had not been disposed of, the fair market value of the collateral at the time of sentencing. This methodology is supported by the sentencing guidelines, as well as other circuits. *see* USSG Sec. 2B1.1, *U.S. v. James,* 592 F3d 1109 (10th Cir. 2010), *U.S. v. McCoy,* 242 F3d 399 (D.C.Cir. 2001, cited by the 4th Cir. in *U.S. v. Leussenhop*, 258 Fed.Appx. 597 (2007)). Contrary to the government's assertion that "property is inherently difficult to value", (*Sentencing Hearing Transcript,* pg. 60), those figures are easily determined, as they are all part of public record. The fair market value could easily have been ascertained by looking at the county tax assessor's records, since the tax collector is charged by statute to assess a reasonable fair market value.

Assuming, for the sake of argument, that the loan amount and fair market value of the one property that was not foreclosed were equal, then the net loss to Countrywide on the five foreclosed properties which Griffin underwrote during her involvement in the conspiracy is $21,356. The record supports this as the "actual loss" that Countrywide incurred which is attributable to Griffin. (*Sentencing Hearing Transcript,* pg. 10-13). This should have resulted in the addition of 4 points to her offense level instead of the 18 she was erroneously assigned. *USSG Sec. 2B1.1(b)(1)(C).* Furthermore, the two points she was given for committing a crime involving ten or more victims should be removed as well, since that calculation is intertwined with the loss calculation, and therefore, must reflect the number of victims attributable to Griffin only.

Restitution must always be based on reliable proof of actual loss. The determination of loss for a defendant's sentencing range may be different than for her restitution obligations. Under the Mandatory Victim Restitution Act (MVRA), *see* 18 USC 3663 *et seq.,* victims seeking to recover their losses from a defendant must prove that the defendant caused the loss and that the loss would not have occurred but for the defendant's misconduct. *U.S. v. Harvey,* 532 F3d 326 (4th Cir. 2008), *US v. Allen,* 529 F3d 390 (7th Cir. 2008), *U.S. v. Petruk,* 484 F3d 1035 (8th Cir. 2007). For restitution purposes the statute requires that the restitution award

be based on the amount of loss actually caused by the defendant. USSG Sec. 5E1.1, *U.S. v. Feldman,* 338 F3d 212 (3rd Cir. 2003).

All Countrywide is entitled to recover from Griffin by way of restitution is the actual loss the company incurred, or $21,356; and that amount would have to be joint and several with all the other co-conspirators, both known and unknown to Griffin, who participated in that portion of the fraud, including, but not limited to George and the appraiser. Countrywide is not allowed to receive a windfall; since they won some and lost some on the ensuing foreclosures, their net loss is all that's recoverable. *U.S. v. Huff,* 2010 WL 2540530 (C.A.11 (Ga.)). Griffin would point out that although she received $56,000 in payments from George, it may seem, on the surface, that the restitution award should require her to give back $56,000 at the least. However, while the fact that a defendant profited from the crime may be an appropriate reason to increase the punishment, restitution to MVRA victims must be based on the amount of loss actually caused by the defendant. *U.S. v. Harvey,* @340, *U.S. v. Chalupnik,* 514 F3d 748 (8th Cir. 2008), *U.S. v. Petruk,* @ 1036.

As further evidence that the loss attributable to Griffin was incorrectly calculated, she points to the fact that the restitution award against at least three other perpetrators was exactly the same amount of $2,787,499.91. Griffin

contends that a restitution award against numerous individuals, some of whom may have never conspired with others during the same limited period of time, could not possibly be identical. Even if that amount were a correct calculation of the total restitution due to all the victims during the full three-year period of the conspiracy, and noting the "joint and several" nature of the award, the court would be required to specify the portion that attaches to the judgment against each defendant.

## **CONCLUSION**

For the reasons advanced in the foregoing arguments, Griffin respectfully requests this Court to hold that under the specific facts and circumstances of this case, (1) trial counsel failed to properly research the law, investigate and prepare a defense, grossly misrepresented to Griffin her trial options, gave deficient, careless and incompetent advice in an effort to unfairly coerce his client to sign an unclear and ambiguous Plea Agreement and Factual Resume, and failed to properly prepare for a complicated sentencing hearing, all resulting in effective assistance of counsel; and

(2) the government committed prosecutorial misconduct by drafting what it knew or should have know was an unclear, ambiguous and misleading Plea Agreement and Factual Resume, and by advocating for a pecuniary loss calculation and

restitution award that it knew or should have known was improperly calculated and would result in an unreasonable sentence and restitution award; and (3) the district court erred at sentencing by miscalculating the victim impact. Therefore, Griffin's sentence should be vacated and her case set for re-sentencing.

Respectfully submitted this the 13th day of April, 2012.

SANDRA BARRETT
ATTORNEY AT LAW

/s/ Sandra Barrett_____
Attorney for Carla Griffin
P. O. Box 18480
Asheville, NC 28814
828-258-9036
barrett.law.nc@gmail.com